IN THE MATTER OF: N.T.

No. COA10-1281

(Filed 2 August 2011)

**Firearms and Other Weapons—assault by pointing a gun—air rifle**

Juvenile adjudication and disposition orders were reversed where they were based on a finding of assault by pointing a gun in violation of N.C.G.S. § 14-34. That statute does not encompass imitation firearms, and the device in this case was an airsoft pump action imitation rifle. Devices which may not be pointed at another under the statute are limited to those fairly characterized as firearms.

Appeal by respondent from adjudication and disposition orders entered 8 July 2010 by Judge James L. Moore, Jr., in Onslow County District Court. Heard in the Court of Appeals 8 March 2011.

*Attorney General Roy Cooper, by Assistant Attorney General Kimberly L. Wierzel, for the State.*

*W. Michael Spivey for Defendant-appellant.*

ERVIN, Judge.

Juvenile N.T. appeals from orders adjudicating him delinquent based upon the trial court's finding that he was responsible for committing an assault by pointing a gun in violation of N.C. Gen. Stat. § 14-34. On appeal, Juvenile argues that the device in question, an airsoft pump action imitation rifle, is not a "gun" as that term is used for purposes of N.C. Gen. Stat. § 14-34, so that the evidence presented to the trial court was insufficient to support a finding of responsibility. After careful consideration of Juvenile's challenge to the trial court's

**IN RE N.T.**

[214 N.C. App. 136 (2011)]

orders in light of the record and the applicable law, we conclude that Juvenile's argument has merit and that the trial court's adjudication and disposition orders should be reversed.

## I. Background

### A. Substantive Facts

On 18 April 2010, Ms. S. was living on Lloyd Street in Holly Ridge, North Carolina, with her husband; J.S., their eight year old son; and C.S., their eleven year old daughter.[1] On that date, C.S. was riding her bike about seven to ten feet from Juvenile and another child, A.C., when she observed that they had a BB gun. As C.S. turned away from them in order to dismount her bike, her shoulder started stinging. C.S. saw "blood gushing out of it and [said that] it . . . was worse than a bee sting[,] it really hurt." According to J.S., A.C. pointed the gun and said, "let's try to shoot your sister." When J.S. refused, "[Juvenile] came up and pulled the trigger." Since A.C. had said that the gun was aimed at the bike, Juvenile thought the gun was pointed at the bike when "he pulled the trigger while the other child held the gun."

After C.S. was injured, J.S. ran inside and told Ms. S. that C.S. had "been shot[.]" When she saw her daughter, Ms. S. observed that C.S.'s right shoulder blade was injured and that her shirt was bloody. Although C.S. passed out on the bathroom floor, a paramedic summoned to examine C.S. concluded that she could wait until the next day to see a doctor.

After observing C.S., Ms. S. stepped outside and saw Juvenile running towards his home. Ms. S. followed him to that location and told Juvenile's mother about the incident. At Juvenile's house, Ms. S. saw ten year old A.C. holding a BB gun.

Ms. S. led A.C. home and told his mother what had happened. Subsequently, Juvenile's parents brought their child to Ms. S.'s house, where he apologized to C.S. and stated that, while A.C. had held and aimed the BB gun, he had pulled the trigger. On the following day, Ms. S. found the pellet that had injured C.S., which she described as a tiny plastic yellow pellet.

Detective Sergeant Darrin Jones of the Holly Ridge Police Department, who had been dispatched to investigate an incident in which "a child had been shot with a BB gun," interviewed Juvenile in

---

1. The children involved in this incident are identified by initials in order to preserve their privacy.

the presence of his father, after first informing Juvenile of his legal rights and obtaining a signed waiver of these rights. Juvenile told Sergeant Jones that he and A.C. were playing with a pellet gun; that A.C. "was going to shoot [J.S.]'s sister;" and that, while A.C. held the gun and pointed it towards the bicycle that C.S. was riding, Juvenile pulled the trigger.

## B. Procedural History

On 3 May 2010, Sergeant Jones filed a juvenile petition with the Onslow County District Court alleging that Juvenile should be adjudicated delinquent for having violated N.C. Gen. Stat. § 14-34. The petition was approved for filing on 3 May 2010. On 8 July 2010, adjudication and disposition hearings were conducted before the trial court. At the conclusion of those proceedings, the trial court adjudicated Juvenile delinquent based upon findings that he was responsible for committing the offense alleged in the petition and determined that Juvenile was subject to the trial court's dispositional authority as a result of the fact that he had committed a serious offense as defined in N.C. Gen. Stat. § 7B-2508(a). In order to reach this conclusion, the trial court specifically determined that "the Pump Air Soft Gun [fell] within the definition of Gun herein" and that Juvenile was "a principal to the [] crime herein based upon the common law legal concept of 'Acting in Concert.' " At the conclusion of the dispositional hearing, the trial court ordered a Level 1 disposition, placing Juvenile on probation for six months subject to supervision by a court counselor. Juvenile noted an appeal to this Court from the trial court's adjudication and dispositional orders.

## II. Legal Analysis

Juvenile was found responsible for committing an assault by pointing a gun. The object that Juvenile and A.C. utilized during the events that led to the trial court's determination was described in the petition and in the testimony received at the hearing as a "BB gun." However, after learning that the gun shot pellets made of plastic, rather than metal, the trial court requested clarification concerning the nature of the device at issue in this proceeding:

COURT: Now just for my information what was the—was this an air soft gun?

[DET.] JONES: It was a Crossley BB rifle, Your Honor . . . . A pump action.

**IN RE N.T.**

[214 N.C. App. 136 (2011)]

COURT: Okay, okay. And did you ever view the pellet, Detective?

. . . .

[MS. S.:] It was yellow and it was plastic and it was about the size of not the writing end of a ball point pen but the top of it as I mentioned.

COURT: See that's what, that's what puzzled me about you know when she said yellow that. But see but it's supposedly a pump, I mean I guess they make them-

RAYNOR: Yep, Judge, I can tell you from having a fourteen year old they make pump air soft guns.

COURT: Okay, okay, so it's truly not a BB gun.

RAYNOR: Right. They make them in pumps they make in them CO-2 cartridges and they make them in-

COURT: In all different configurations.

RAYNOR: Yes sir.

Thus, the undisputed evidence reflects that Juvenile was adjudicated delinquent as the result of his involvement in the use of an airsoft gun from which plastic pellets were fired using a "pump action" mechanism.[2] On appeal, Juvenile argues that this device does not constitute a "gun" for purposes of N.C. Gen. Stat. § 14-34, which prohibits "point[ing] any gun or pistol at any person, either in fun or otherwise, whether such gun or pistol be loaded or not loaded[.]" Thus, the ultimate issue that we must resolve in order to determine the validity of Juvenile's challenge to the trial court's orders is the extent, if any, to which the device that Juvenile utilized was a "gun or pistol" as those terms are utilized in N.C. Gen. Stat. § 14-34.

"The principal goal of statutory construction is to accomplish the legislative intent." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (citing *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297, 507 S.E.2d 284, 290 (1998), *cert. denied*, 526 U.S. 1098, 143 L. Ed. 2d

___

2. According to 15 U.S.C. § 5001(c), an airsoft gun is included within a category consisting of "any imitation of any original firearm which was manufactured, designed, and produced since 1898, including and limited to toy guns, water guns, replica nonguns, and air-soft guns firing nonmetallic projectiles." "[E]ach toy, look-alike, or imitation firearm shall have as an integral part, permanently affixed, a blaze orange plug inserted in the barrel of such toy, look-alike, or imitation firearm." 15 U.S.C. § 5001(b)(2).

671, 119 S. Ct. 1576 (1999)). "The best indicia of that intent are the language of the statute . . . the spirit of the act and what the act seeks to accomplish." *Concrete Co. v. Board of Commissioners*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980). "When construing an ambiguous criminal statute, we must apply the rule of lenity, which requires us to strictly construe the statute in favor of the defendant. 'However, this [rule] does not require that words be given their narrowest or most strained possible meaning. A criminal statute is still construed utilizing 'common sense' and legislative intent.' " *State v. Conway*, 194 N.C. App. 73, 79, 669 S.E.2d 40, 44 (2008) (citing *State v. Hinton*, 361 N.C. 207, 211, 639 S.E.2d 437, 440 (2007) (internal quotation omitted) and quoting *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005)), *disc. rev. denied*, 363 N.C. 132, 673 S.E.2d 665 (2009). "Questions of statutory interpretation are questions of law, reviewed de novo on appeal." *State v. West*, ___ N.C. App. ___, ___, 689 S.E.2d 216, 221 (2010) (citing *Piedmont Triad Airport Auth. v. Urbine*, 354 N.C. 336, 338, 554 S.E.2d 331, 332 (2001), *cert. denied*, 535 U.S. 971, 152 L. Ed. 2d 381, 122 S. Ct. 1438 (2002)).

The issue raised by Juvenile's appeal is, at bottom, a definitional one. Although the parties appear to agree that an airsoft rifle of the type at issue here is not a "firearm"[3] or a "pistol," they disagree sharply about whether it is a "gun." Thus, our inquiry must, necessarily, focus on whether the airsoft rifle involved in the incident that led to Juvenile's adjudication as a delinquent is or is not a "gun."

The term "gun" is not defined in N.C. Gen. Stat. § 14-34 or in any other statutory provision that is directly or indirectly applicable to N.C. Gen. Stat. § 14-34. In addition, the parties have not cited any prior decision of the Supreme Court or this Court adopting any particular definition for use in construing N.C. Gen. Stat. § 14-34. Although the parties have expended substantial energy discussing the wording of various other statutory provisions, none of them either resolve the definitional issue presented for our consideration in this case or shed much light on its proper resolution.[4] As a result, we are

---

3. The parties also accept the definition of a "firearm" set forth in N.C. Gen. Stat. § 14-409.39(2) (providing that a "firearm" is "[a] handgun, shotgun, or rifle which propels a projectile by action of an explosion") as acceptable for purposes of this case.

4. A number of statutory provisions discussed in the parties' briefs do tend to differentiate between "BB guns, stun guns, air rifles, and air pistols," on the one hand, and a "gun, rifle, pistol or other firearm," on the other. N.C. Gen. Stat. §§ 14-269.2(b) and (d). Although this language might tend to suggest that a "gun" was included within the category of "firearms" for purposes of certain criminal statutes prohibiting the pos-

**IN RE N.T.**

[214 N.C. App. 136 (2011)]

forced, of necessity, to utilize general principles of statutory construction in order to determine whether the device utilized by Juvenile in this case was or was not a "gun."

"Nothing else appearing, the legislature is presumed to have used the words of a statute to convey their natural and ordinary meaning." *Wood v. Stevens & Co.*, 297 N.C. 636, 643, 256 S.E.2d 692, 697 (1979) (citing *In re Trucking Co.*, 281 N.C. 242, 252, 188 S.E.2d 452, 458 (1972) and *State v. Wiggins*, 272 N.C. 147, 153, 158 S.E.2d 37, 42 (1967), *cert. denied*, 390 U.S. 1028, 20 L. Ed. 2d 285, 88 S. Ct. 1418 (1968)). "In the absence of a contextual definition, courts may look to dictionaries to determine the ordinary meaning of words within a statute." *Perkins v. Arkansas Trucking Servs., Inc.*, 351 N.C. 634, 638, 528 S.E.2d 902, 904 (2000) (citing *Black v. Littlejohn*, 312 N.C. 626, 638, 325 S.E.2d 469, 478 (1985) and *State v. Martin*, 7 N.C. App. 532, 533, 173 S.E.2d 47, 48 (1970)). As a result, we will attempt to make the required definitional decision on the basis of these well-established principles of statutory construction.

According to H. Black, BLACK'S LAW DICTIONARY 836 (rev. 4th ed. 1968), a "gun" is "[a] firearm for throwing a projectile with gunpowder," "[a] portable firearm," or "[a] pistol or revolver." Similarly, a "gun" has been defined as "a weapon incorporating a metal tube from which bullets, shells, or other missiles are propelled by explosive force, typically making a characteristic sharp noise." *New Oxford American Dictionary* 724 (3d ed. 2010). These definitions, which generally tend to equate "guns" to "firearms" and emphasize the use of "explosive force" as compared to the use of some other motivating agent, such as air pressure, would seem to exclude an airsoft rifle like the one at issue here from the definition of a "gun." Such a result seems consistent with the manner in which the Supreme Court has, in admittedly different contexts, defined the term in question. For example, in *State v. Barnes*, 253 N.C. 711, 713-14, 117 S.E.2d 849, 850 (1961), in which a defendant charged with assault by pointing a gun in violation of N.C. Gen. Stat. § 14-34 argued that a "pistol" was not a "gun," the Supreme Court stated that:

The word gun is a generic term and includes pistol. According to Webster's New International Dictionary, 2d. Ed., the word "gun" is

session of weapons on the campuses of educational institutions, it is not clear to us that this language has any relation to the proper construction of N.C. Gen. Stat. § 14-34, which is located in an entirely different portion of Chapter 14 of the North Carolina General Statutes and which is obviously focused on a subset of the items listed in the various provisions contained in N.C. Gen. Stat. § 14-269.2.

defined, "6. A revolver or pistol. Orig., Western U.S." In common usage the words "pistol" and "gun" are used interchangeably.

(citing *Muse v. Interstate Life & Accident Co.*, 45 Ga. App. 839, 840, 166 S.E. 219, 220 (1932), *State v. Christ*, 189 Iowa 474, 482, 177 N.W. 54, 57 (1920), and *State v. Barrington*, 198 Mo. 23, 109, 95 S.W. 235, 263 (1906)). Similarly, while addressing an argument advanced by the defendant in *State v. Banks and State v. Pauling*, 271 N.C. 583, 157 S.E.2d 145 (1967), to the effect that there was a material variance between the indictment charging the defendant with committing a robbery, which alleged the use of a "pistol," and the proof offered in support of that indictment at trial, which involved references to the use of a "gun," the Supreme Court, in reliance on *Barnes*, stated that:

> The word "gun" is a generic term including a variety of firearms ranging in size and shape from the largest cannon to the smallest pistol. It is a matter of common knowledge that in everyday speech, on television programs and elsewhere, a pistol is frequently called a "gun." [T]his is not a misuse of the term "gun" . . . .

*Id.* at 585, 157 S.E.2d at 146-47 (citing *Barnes*, 253 N.C. at 713-14, 117 S.E.2d at 850, BLACK'S LAW DICTIONARY, and Webster's New International Dictionary, 2d Ed.) (other citation omitted). Finally, in *State v. Faulkner*, 5 N.C. App. 113, 168 S.E.2d 9 (1969), in which the defendant was charged with robbery with a dangerous weapon and in which "State's witness Smith testified that the defendant Arthur Smith told him that defendant Donald Faulkner got a 'Roscoe' at a poolroom, and that Donald Faulkner told him that 'he pulled a gun out of his pocket and hit the woman on the head,' " this Court stated that:

> A pistol is sometimes referred to as a "Roscoe." A pistol is a "short firearm, intended to be aimed and fired from one hand." Black's Law Dictionary, Fourth Edition. A gun is a portable firearm and usually includes pistols, carbines, rifles, and shotguns.

*Faulkner*, 5 N.C. App. at 119, 168 S.E.2d at 13. As a result, consistently with the definitions contained in the dictionaries that we have consulted, the prior North Carolina appellate decisions have tended to treat the word "gun" as an informal synonym for "firearm."[5] We conclude, consistently with Juvenile's contention, that the term "gun" as

---

5. We note that the Supreme Court of North Carolina "concluded in [*State v.*] *Alston*, [305 N.C. 647, 290 S.E. 2d 614 (1982),] that a BB rifle could not be a firearm or other dangerous weapon within the meaning of the armed robbery statute because it was incapable of endangering or threatening a person's life." *State v. Allen*, 317 N.C. 119, 123, 343 S.E.2d 893, 896 (1986).

**IN RE N.T.**

[214 N.C. App. 136 (2011)]

used in N.C. Gen. Stat. § 14-34 encompasses devices ordinarily understood to be "firearms" and not other devices that fall outside that category.[6] Such a construction of N.C. Gen. Stat. § 14-34 is also consistent with the rule of lenity, which requires us to construe ambiguous criminal statutes to limit the reach of the criminal sanction in the absence of a valid reason to do otherwise.

In seeking to persuade us to reach a contrary result, the State contends that the word "gun" should be understood as a "broader" term that encompasses, in addition to firearms, other devices, including the airsoft gun in this case. The State does not, however, explain exactly what this "broader" definition would encompass or how such a definition should be applied to the facts of specific cases. Moreover, the State does not cite any authority defining "gun" in this manner or suggesting that the word "gun" is a "broader" term that encompasses, in addition to traditional firearms, other unspecified devices. The absence of any authority tending to establish that the word "gun" as used in N.C. Gen. Stat. § 14-34 encompasses devices other than "firearms" further supports our conclusion that the two are synonymous for purposes of the relevant statutory provision.[7]

As part of its argument in support of a decision affirming the trial court's orders, the State contends that a broad interpretation of the word "gun" as used in N.C. Gen. Stat. § 14-34 would facilitate implementation of the policy goals sought to be achieved by the enactment of that statutory provision. At least three obvious purposes are served by prohibiting an individual from pointing a firearm at another person: (1) preventing accidental injuries that may occur when a person "didn't know it was loaded"; (2) preventing the escalating violence that may occur after one person points a gun at another; and (3) preventing a person from being placed in fear of imminent death or serious bodily harm when another person points a gun at him or her.

6. Although the State argues that equating a "gun" with a "firearm" ignores the fact that the General Assembly used the term "firearm" in some statutory provisions and the word "gun" in others and that this fact suggests that the General Assembly believed that the two words meant different things, we do not find this logic particularly compelling given that the statutory provisions in question were enacted at different times, are intended to address different ills, and cannot be described as part of a systematic statutory scheme regulating the use and misuse of guns, firearms, or other weapons.

7. In its brief, the State argues that construing N.C. Gen. Stat. § 14-34 in the manner that we deem appropriate would deprive N.C. Gen. Stat. § 14-33(c)(1), which prohibits assaults committed with the use of a deadly weapon, of any independent meaning. We do not, however, believe that this argument has merit given that N.C. Gen. Stat. § 14-33(c)(1) applies to assaults committed with deadly weapons other than firearms and a broader category of assaults than the simple pointing of a firearm.

Admittedly, making it a criminal offense to point an imitation firearm at another might, under some circumstances, serve to effectuate the accomplishment of one or more of the goals outlined above.[8] However, the extent to which the pointing of a device other than one clearly specified in the relevant statutory language should constitute a criminal offense is a question for the General Assembly and not for this Court, particularly given the many policy-related questions that would need to be addressed and resolved before such situations were deemed punishable through the criminal justice system or correctable through the juvenile courts.[9] " 'It is critical to our system of government and the expectation of our citizens that the courts not assume the role of legislatures.' Normally, questions regarding public policy are for legislative determination." *Cochrane v. City of Charlotte*, 148 N.C. App. 621, 628, 559 S.E.2d 260, 265 (quoting *State v. Arnold*, 147 N.C. App. 670, 673, 557 S.E.2d 119, 121 (2001), *aff'd*, 356 N.C. 291, 569 S.E.2d 648 (2002), and citing *Martin v. Housing Corp.*, 277 N.C. 29, 41, 175 S.E.2d 665, 671 (1970)), *disc. review denied*, 356 N.C. 160, 568 S.E.2d 189 (2002). As a result, although there are potential policy-related arguments that might suggest the appropriateness of an outcome consistent with the position advocated by the State in this case, the adoption of those arguments as a basis for construing N.C. Gen. Stat. § 14-34 in a manner that has little, if any, support in the relevant statutory language, would be inconsistent with the applicable rules of statutory construction, leaving us little option except to conclude that those arguments are more appropriately directed to the General Assembly than to this Court.

---

8. The facts of this case reveal that the improper use of an airsoft gun can cause a painful injury. Moreover, the pointing of an airsoft gun that closely resembles an actual firearm might result in escalating violence or severely frighten the person at whom it was pointed. As a result, we recognize that a number of the purposes that motivated the enactment of N.C. Gen. Stat. § 14-34 might be served by adopting a construction of the relevant statutory language like that advocated by the State.

9. For example, we might reasonably assume that pointing a bright pink water gun would not be punishable as a misdemeanor under even the most expansive definition of a "gun" that would be consistent with the approach advocated by the State. However, there is nothing in the relevant statutory language that would permit a trial or appellate court to distinguish between the imitation firearms that would or would not be subject to the criminal sanction under such an interpretation of N.C. Gen. Stat. § 14-34. Although we can conceive of various criteria that might reasonably be applied for that purpose, such as limiting the reach of N.C. Gen. Stat. § 14-34 to imitation firearms that closely resemble actual firearms in appearance, to imitation firearms that shoot metal pellets, or to imitation firearms that have a specific minimum muzzle velocity, the absence of statutory language tending to support the validity of any of these limitations suggests that the extension of N.C. Gen. Stat. § 14-34 to imitation firearms is a task for the legislative rather than the judicial branch of government.

**IN RE N.T.**

[214 N.C. App. 136 (2011)]

Thus, we conclude that the criminal offense penalized in N.C. Gen. Stat. § 14-34 does not encompass the pointing of an imitation firearm. Simply put, the literal language of N.C. Gen. Stat. § 14-34 is ambiguous. To the extent that we are able to derive any assistance from that statutory language using traditional principles of statutory construction, we believe that the devices which one is forbidden to point at another are limited to items fairly characterized as firearms, not a broader category of devices. In such circumstances, the rule of lenity suggests that we should interpret the existing statutory language narrowly, leaving any expansion of the scope of the existing statutory language to the political, rather than the judicial, branch of government. Needless to say, our conclusion that the airsoft pistol at issue here is not a "gun" for purposes of N.C. Gen. Stat. § 14-34 has no bearing on the issue of whether Juvenile might be subject to being found delinquent for assault with a deadly weapon inflicting serious injury in violation of N.C. Gen. Stat. § 14-32(b), assault with a deadly weapon or assault inflicting serious injury in violation of N.C. Gen. Stat. § 14-33(c)(1), or assault on a child under the age of twelve in violation of N.C. Gen. Stat. § 14-33(c)(3). As a result, we conclude that N.C. Gen. Stat. § 14-34 does not, as presently written, permit the imposition of criminal or juvenile sanctions upon an individual who points an airsoft gun or other imitation firearm at another person and that the trial court erred by finding Juvenile to be a delinquent juvenile on that basis.[10]

## III. Conclusion

Thus, for the reasons discussed above, we conclude that the evidence presented at the adjudication hearing did not support the trial court's determination that Juvenile's acts would have constituted a violation of N.C. Gen. Stat. § 14-34 had they been committed by an adult and that Juvenile was subject to supervision on the grounds of delinquency. As a result, the trial court's adjudication and disposition orders should be, and hereby are, reversed.

REVERSED.

Judges ROBERT C. HUNTER and STEPHENS concur.

---

10. As a result of our determination that N.C. Gen. Stat. § 14-34 does not render the pointing of an airsoft rifle like the one used here a criminal offense, we need not address Juvenile's remaining challenge to the sufficiency of the evidence to support his adjudication.